**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MICHAEL WALTERS,**

      **Petitioner,**               **CASE NO. 2:09-CV-446**
                                                  **JUDGE WATSON**
      **v.**                       **MAGISTRATE JUDGE KING**

**MICHAEL SHEETS, WARDEN,**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the petition, Doc. No. 2, respondent's return of writ, Doc. No. 6, petitioner's traverse, Doc. No. 13, petitioner's supplemental authority, Doc. No. 15, respondent's reply, Doc. No. 18, and respondent's supplemental memorandum, Doc. No. 20. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the petition for a writ of habeas corpus be **GRANTED** on claim four, and that this action be **REMANDED** to the state trial court for re-sentencing. The Magistrate Judge further **RECOMMENDS** that the remainder of petitioner's claims be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> By joint indictment filed June 17, 2005, defendant and William Dustin McKenzie each were charged with one count of murder in violation of R.C. 2903.02(B) and one count of felonious assault in violation of R.C. 2903.11, all arising out of the death of Richard J. Strojny following a June 7, 2005 incident. On November 22, 2005, defendant filed a motion to sever his trial from that of McKenzie; on January 30, 2006, the trial court denied defendant's motion.

The defendants were jointly tried by jury in May 2006. The jury found defendant guilty as charged in the indictment and McKenzie guilty of assault as a misdemeanor of the first degree. The trial court sentenced defendant to a term of 15 years to life for the offense of murder and a consecutive term of five years for the predicate offense of felonious assault.

\*\*\*

Defendant, McKenzie, and Richard Strojny ("Strojny") lived in the same neighborhood. The three men, along with other neighbors, often socialized and frequently engaged in "horseplay" while drinking. The "horseplay" often included McKenzie placing someone in a headlock.

Around noon on June 7, 2005, defendant and McKenzie began drinking as they worked on McKenzie's car. Over the course of the afternoon and early evening, Strojny and another neighbor, Dave Corfman, joined the group. At some point, defendant put his hand in Strojny's face; in response, Strojny twisted defendant's injured arm. When Strojny did not heed defendant's request to be released, defendant became angry and challenged Strojny to a boxing match. Defendant cursed and boasted to Strojny that he would "kick his ass," "fucking kill [him]," and "put [him] down in three punches." (Tr. 1004-1005, 1386, 1530.) McKenzie intervened and diffused the situation. Corfman returned home; Strojny, defendant and McKenzie eventually walked to Strojny's house, where they continued drinking.

The events precipitating Strojny's death occurred in the front yard of Strojny's home sometime after 10:00 p.m. the same day. According to defendant's account of events, McKenzie and Strojny began arguing about an "incident" that occurred several months earlier concerning Ashley, the girlfriend of Strojny's son Nicholas. (Tr. 1395.) As the argument intensified, Strojny poked at McKenzie. After McKenzie smacked Strojny's hand away, Strojny punched McKenzie in the head. McKenzie jumped on Strojny's back and put him in a headlock. With McKenzie still on Strojny's back and his arm around Strojny's neck, the two fell to the ground and rolled down an incline onto the driveway. When Strojny attempted to stand up, he lunged forward. He and McKenzie hit the car parked in the driveway, and the two fell down on the driveway between the car and the concrete. According to defendant, Strojny, still in McKenzie's headlock, was down on one knee with his foot against the bottom step. He was trying to break the headlock by pressing McKenzie's body into the side of a car parked

2

at the bottom of the steps at the edge of the driveway.

McKenzie called to defendant to get Strojny off him. Strojny, however, attempted to free himself by flipping McKenzie over his head. McKenzie and Strojny, still in the headlock, spun in a full circle and fell down toward the steps. According to defendant, Strojny's head "hit the steps." (Tr. 1483.) Strojny then "popped up" and almost "tackled" defendant, causing defendant and Strojny to fall into the steps. *Id.* at 1410-1411. As a result, defendant's leg was pinned under Strojny. After defendant freed himself, he noticed Strojny lying motionless on the driveway. "[S]cared, and in a panic and drunk," defendant told McKenzie they both should leave the area. *Id.* at 1414. Defendant stopped briefly at his house and then went with a neighbor to a fast food restaurant.

According to McKenzie's version of the events, while he, Strojny, and defendant drank and talked in Strojny's front yard, the conversation turned to arm wrestling and body building. Strojny and defendant teased McKenzie about his relatively small stature, because at 5'9″ and 170 pounds, McKenzie was much smaller than either 6', 240-pound defendant or 6', 305-pound Strojny. Strojny grabbed McKenzie's arm and pulled it behind him. McKenzie freed himself, jumped on Strojny's back, and put him in a headlock. McKenzie estimated that Strojny was in the headlock for only five to ten seconds. McKenzie, however, admitted that during the headlock he could not touch the ground, so his full body weight was hanging from Strojny's neck. Upset, Strojny flipped McKenzie over his head. McKenzie landed on his back. Strojny straddled him and punched him in the face; McKenzie retaliated, punching Strojny in the face. When McKenzie attempted to roll away, he ran into Strojny's leg, and Strojny fell on McKenzie. The two rolled down the incline onto the driveway where the car parked on the driveway halted their momentum. According to McKenzie, Strojny was no longer in the headlock, and the fall did not cause Strojny to hit his head on the concrete steps.

At this point, McKenzie was pinned under Strojny. Defendant ran down the hill and twice kicked Strojny in the head "[l]ike if you're kicking a football." (Tr. 1544.) In all, defendant kicked Strojny more than five times. Defendant then straddled Strojny and punched him 20-30 times in the back of the head. McKenzie heard "one good hit" and Strojny fell like "dead weight" onto McKenzie. *Id.* at 1545. According to McKenzie, the punch "knocked [Strojny] out cold." *Id.*

3

at. 1546.

McKenzie yelled to defendant to get Strojny off of him. Defendant grabbed Strojny's shoulders and pulled him backward and "threw him up there * * * towards the steps." (Tr. 1547.) Strojny landed on his back with his head on the bottom step where defendant stomped and kicked Strojny's head and chest. McKenzie told defendant to "quit kicking him in the * * * head, he's not moving." (Tr. 1549.) Defendant left the scene. McKenzie observed that Strojny rolled from the steps onto the driveway and was motionless and nonresponsive.

Two neighbors, Bettina Worboy and Tonda Harris, witnessed part of the incident. According to Bettina, she was sitting on the front porch of her house and saw defendant, McKenzie, and Strojny drinking and talking loudly in front of Strojny's house. She heard McKenzie apologize to Strojny and say he just wanted to tell Nicholas he was sorry. At some point, McKenzie put Strojny in a headlock for 10-20 seconds, and Strojny fell to his knees. Bettina assumed the men were just goofing around because they were intoxicated. Bettina went inside her house for a short time, and when she returned outside she overheard McKenzie say, "Mike get him off me." (Tr. 680.) She heard a "pounding" noise that she described as a "bone crunching sound." *Id.* She ran toward Strojny's house and heard McKenzie say, "Mike, quit kicking him in the head, man." *Id.* At trial, Bettina admitted she told police McKenzie said, "Mike, stop kicking him," but she was adamant at trial that McKenzie implored defendant to stop kicking Strojny "in the head." *Id.* at 702-705. As defendant left the area, he noticed Bettina and said "[y]ou bitch, get back, I'll get you, you bitch." *Id.* Bettina perceived the comment as a threat. *Id.* at 682.

Tonda testified she returned home sometime after 10:00 p.m. and heard a commotion at Strojny's house. Bettina called to her from across the street. As Tonda walked toward Bettina, she noticed Strojny lying on the ground. McKenzie was kneeled down, punching at something; defendant was aggressively "stomping" at something. (Tr. 374.) Tonda retrieved her cell phone from her car and called 9-1-1. When she returned, defendant was not at the scene, but McKenzie was attempting to help Strojny. McKenzie was upset and reported that Strojny kicked him in the face; he did not mention defendant.

A short time later, Bettina found Strojny lying on the driveway close to the steps. His head was enlarged and his ear was bloody and

4

distorted. One of the steps had blood and hair on it. Bettina's husband, Bryan, noticed the activity at Strojny's and came across the street to investigate. McKenzie was crying and said he tried to help Strojny. Bryan awakened Nicholas, who was asleep in the house, and reported that his father was badly beaten. Nicholas, Bryan, and McKenzie carried Strojny from the driveway into the front yard and waited for an ambulance to arrive.

Law enforcement personnel arrived at the scene and interviewed several witnesses. An officer asked McKenzie if he was involved; McKenzie replied that "he [Strojny] hit me a couple of times so I guess I was involved." McKenzie did not tell the officer that defendant kicked Strojny. (Tr. 323.) Nicholas told police McKenzie was "babbling" and said something like "we were just playing." *Id.* at 293. According to Nicholas, McKenzie also asserted that although defendant thought Strojny was going to hurt McKenzie badly, "he didn't mean it to go this far." *Id.* Bryan told police McKenzie said defendant was stomping and kicking Strojny's head.

In the meantime, defendant returned from his trip to the restaurant. He had the neighbor drop him off in the street behind his house because he realized the police were at Strojny's house. Bryan and two other men saw defendant and called his name. Defendant slipped between two houses in an apparent attempt to hide from the men. Bryan identified defendant to a patrol officer as being involved in the fight. The officer detained defendant without incident.

Strojny died from his injuries on June 8, 2005. Dr. Steven Sohn, a board-certified forensic pathologist, performed an autopsy on behalf of the Franklin County Coroner's office and prepared a report of his findings. Dr. Sohn identified autopsy photographs that depicted a large contusion covering the entire right side of Strojny's skull, indicating Strojny suffered multiple blunt force impacts to the head. Dr. Sohn opined that such trauma caused Strojny's brain to swell, resulting in herniation of the brain through the base of the skull that exerted pressure on the part of the brain controlling heart and lung function. Dr. Sohn also testified Strojny suffered swelling and hemorrhaging of the neck musculature and a fracture of the hyoid bone, the wishbone-shaped bone contained in the musculature at the base of the tongue. Dr. Sohn opined that these injuries are consistent with manual strangulation, but he admitted such injury could result from an impact to the throat. According to Dr. Sohn, the fractured hyoid bone resulted in massive bleeding inside Strojny's neck and

alone could have caused death.

Based on his findings, Dr. Sohn concluded that the "immediate cause" of Strojny's death was a "craniocerebral blunt force injury," meaning a "closed-head injury." (Tr. 524, State's Exhibit I.) The "mechanism" of the injury was Strojny's "head falling in a rapid speed and impacting [a] hard object." (Tr. 525.) Dr. Sohn explained that kicking or stomping a person's head while up against a concrete block would "accelerate the process of brain swelling and death." *Id.* at 559. Dr. Sohn clarified that strangulation was a "contributing cause" of Strojny's death. *Id.* at 526-527.

Defendant's expert, Dr. Christopher Demas, a board-certified family medicine specialist, reviewed several of the autopsy photographs, as well as Dr. Sohn's report, but Dr. Demas did not perform or observe the autopsy and did not confer with Dr. Sohn. Dr. Demas opined that Strojny's death was caused by a "one-two punch" of significant neck trauma that created increased cranial pressure and cut off blood to the brain, followed by "craniocerebral blunt force injuries." He further opined that strangulation via a headlock was sufficiently severe to fracture the hyoid bone and cause the severe damage to the neck musculature that contributed to Strojny's death. He, however, further testified that a blow to the head was the "final cause" of death. (Tr. 1209.)

*State v. Walters*, No. 06AP-693, 2007 WL 3026956, at *1-5 (Ohio App. 10th Dist. Oct. 18, 2007).

Petitioner filed a timely appeal, in which he asserted the following assignments of error:

1. The trial court erred in failing to sever the trials of the codefendants, who presented mutually antagonistic defenses and were prevented from fully defending against the allegations because of the joint trial.

2. The trial court erred in failing to grant a defense request for a continuance because of the failure of the prosecution to provide discoverable material as required by Crim.R. 16 and *Brady v. Maryland* (1963), 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194.

3. The trial court erred in entering a guilty verdict on the charge of felony murder as R.C. 2903.02(B) expressly provides that the statute is inapplicable when the defendant can be charged with involuntary

6

manslaughter.

4.  The trial court improperly excluded evidence of a rape allegation against the co-defendant that was the basis for the argument that led to the victim's death. The evidence was relevant and material to Appellant's defense.

5.  The trial court improperly castigated defense counsel and threatened to take disciplinary action against him in the presence of the jury and in a manner that prejudiced Appellant.

6.  The trial court improperly permitted the prosecutors to stage an impromptu re-enactment in the courtroom to prove that Appellant's version of events was not believable. This reenactment made the prosecutors['] witnesses in violation of the Rules of Professional Responsibility and lacked foundational support to establish that it was a truthful and reliable re-enactment.

7.  The trial court erred in sentencing Appellant to consecutive terms for the offenses of felonious assault and felony murder premised on felonious assault, in violation of the double jeopardy protections under the state and federal Constitutions.

8.  There was insufficient evidence to support the guilty verdicts by proof beyond a reasonable doubt and those verdicts were against the manifest weight of the evidence, thereby, depriving Appellant of due process protections under the state and federal Constitutions.

*See id.* On October 18, 2007, the appellate court affirmed the trial court's judgment. *Id.* On March

12, 2008, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Walters*, 117

Ohio St.3d 1425 (2008).  On March 8, 2007, petitioner filed a petition for post conviction relief in

the state trial court.  He alleged that the trial court erred in denying his motion for a severance of trials

and in failing to grant a defense request for a continuance. *Exhibit 23 to Return of Writ*.  The record

fails to reflect whether the trial court has ever issued a ruling on petitioner's post conviction petition.

 On January 29, 2009, petitioner filed a motion for reconsideration in the state appellate court;

however, on April 7, 2009, the Ohio Court of Appeals denied petitioner's motion for reconsideration.

*Exhibit 19 to Return of Writ.*  Petitioner filed a timely appeal from that decision.  *See Exhibits 20, 21 to Return of Writ.*  On August 26, 2009, the Ohio Supreme Court dismissed petitioner's subsequent appeal.  *See Respondent's Supplement to the Record,* Doc. 20.

On June 5, 2009, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  Petitioner's right to a fair trial and due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court denied Petitioner's request to be tried separately from his co-defendant.

> 2.  Petitioner's right to a fair trial and due process of law was violated when the trial court failed to grant defense counsel's request for a continuance to investigate evidence not presented in discovery, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

> 3.  Petitioner's right to a fair trial and due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, were violated when the trial court failed to admit evidence that was relevant and favorable to Petitioner because it prejudiced the co-defendant.

> 4.  The trial court erred by sentencing Petitioner to consecutive terms of imprisonment for the charges of felony murder and felonious assault (the underlying predicate offense) in violation of the Fifth and Fourteenth Amendment to the United States Constitution.

It is the position of the respondent that petitioner's claims fail to present issues appropriate for federal habeas corpus review, are waived, and are without merit.

### CLAIMS ONE AND THREE

8

In claim one, petitioner asserts that he was denied a fair trial because the trial court denied his motion to sever his trial from that of his co-defendant. The state appellate court rejected this claim as follows:

> Defendant's first assignment of error contends the trial court erred in denying his motion to sever his trial from McKenzie's trial.
>
> Pursuant to Crim.R. 8(B), two defendants may be jointly indicted and tried for a non-capital offense as long as "they are alleged to have participated in the same act or transaction * * * or in the same course of criminal conduct." *State v. Cotton* (Dec. 6, 1996), Montgomery App. No. 15115. As a general rule, the law favors joinder of defendants and the avoidance of multiple trials because it " 'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.' " *State v. Daniels* (1993), 92 Ohio App.3d 473, quoting *State v. Thomas* (1980), 61 Ohio St.2d 223, 225. Nonetheless, a defendant may move for severance pursuant to Crim.R. 14. "If it appears that a defendant or the state is prejudiced by a joinder of * * * defendants * * * for trial * * *, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.
>
> To demonstrate a trial court's error in denying severance, a defendant must establish: "(1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim* (1992), 65 Ohio St.3d 51, 59, citing *State v. Torres* (1981), 66 Ohio St.2d 340, syllabus. A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157.
>
> Defendant contends severance was warranted because he and McKenzie presented mutually antagonistic defenses, each arguing the other caused Strojny's death. Defenses are mutually antagonistic where each defendant attempts to exculpate himself and inculpate his

9

co-defendant. *Daniels,* supra, at 486. To merit severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. *United States v. Berkowitz* (C.A.5, 1981), 662 F.2d 1127, 1133. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. *Id.* at 1134. "In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " *Id.,* quoting *United States v. Eastwood* (C.A.5, 1973), 489 F.2d 818, 822, n. 5, quoting *United States v. Robinson* (D.C.Cir.1970), 432 F.2d 1348, 1351.

"Antagonistic defenses can prejudice co-defendants to such a degree that they are denied a fair trial." *Daniels,* supra. Nonetheless, in *Zafiro v. United States* (1993), 506 U.S. 534, the court rejected any bright-line rule mandating severance whenever codefendants asserted conflicting defenses, holding that "[m]utually antagonistic defenses are not prejudicial *per se.*" *Id.* at 538. Elaborating, the court stated "[w]e believe that, when defendants properly should have been joined under [Federal Criminal] Rule 8(b), a [trial] court should grant a severance under [Federal Criminal] Rule 14 only if there is a serious risk that a joint trial could compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

The *Zafiro* court described the type of prejudice that might warrant severance, stating, "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty." *Id.* The court further noted "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.*

Citing *Bruton v. United States* (1968), 391 U.S. 123, defendant asserted separate trials were required because defendant's Sixth Amendment right of confrontation would be violated if the state

introduced a statement McKenzie made to law enforcement personnel implicating defendant. In addition, defendant summarily asserted separate trials were necessary because he and McKenzie intended to present mutually antagonistic defenses at trial.

In denying the motion, the trial court noted a *Bruton* problem arises only when the trial court admits into evidence a non-testifying defendant's statement that implicates the other defendant in criminal activity. If, the court concluded, the statement is not offered or admitted in the state's case-in-chief, or if the co-defendant testifies, severance is not required. The court determined that should the state attempt to admit such a statement in its case-in-chief, the court would declare the statement inadmissible and thus preserve defendant's confrontation rights. On that basis, the trial court overruled defendant's motion. The court did not specifically address the issue of mutually antagonistic defenses.

Although it is not part of the record on appeal in this case, McKenzie apparently also filed a motion to sever in mid-April 2006. According to the motion hearing transcript, made part of the record here, defendant "[stood] on" his prior motion and offered no further argument. (Tr. 10.) McKenzie asserted that pursuant to an impending forensic report from defendant's expert medical witness, defendant and McKenzie were prepared to present mutually antagonistic defenses concerning the cause of Stojny's death. McKenzie maintained defendant and McKenzie should be tried separately due to the potentially prejudicial effect of the conflicting defense theories on their right to a fair trial. The trial court found the motion premature, as the forensic report had yet to be filed. The court apparently later overruled the motion.

Prior to jury voir dire, defendant orally moved for severance pursuant to *Bruton,* this time on the ground McKenzie recently proffered a statement to the prosecution inculpating defendant. The state asserted the statement was proffered in an attempt to resolve the case against McKenzie and, since that effort had failed, the statement was inadmissible. McKenzie orally renewed his request for severance due to the impending presentation of mutually antagonistic defenses. The trial court overruled both motions, and the case proceeded to trial. Defendant renewed the motion for severance both at the close of the state's case and at the close of his own case.

Initially, we note judicial economy weighs in favor of the trial court's

11

decision to try defendant and McKenzie together. The state called several witnesses and introduced numerous exhibits in its case-in-chief, nearly all of which would appear to be duplicated in separate trials against defendant and McKenzie. Judicial economy, however, does not outweigh a defendant's right to a fair trial. *State v. Brown* (Oct. 11, 1985), Montgomery App. No. CA 8560. The issue thus resolves to whether the trial court's refusal to sever the trials denied defendant a fair trial.

The record belies defendant's claim that he and McKenzie presented mutually antagonistic defenses. Initially, defendant never articulated a clear defense theory and thus did not provide the court with sufficient information so it could weigh the noted considerations favoring joinder against defendant's right to a fair trial. *Schaim,* supra. Defendant's pretrial motion, as well as his renewed motion prior to voir dire, lacked specificity about the nature of his defense.

Equally damaging to his motion, defendant during trial presented two alternative defense theories. In opening statement, defendant asserted a "one-two punch" causation theory for Strojny's death. According to that defense, the headlock McKenzie imposed on Strojny resulted in a fractured hyoid bone that, in turn, caused intracranial pressure to the brain. The intracranial pressure, followed by Strojny's hitting his head on the concrete steps while still in the headlock, combined to cause Strojny's death. Defendant, however, asserted a second defense theory: believing McKenzie to be in imminent danger of serious physical harm from Strojny, defendant justifiably caused Strojny's death in coming to McKenzie's aid.

Although ostensibly pursuing his dual defenses during trial, defendant in reality relied on his "defense of another" argument. For example, in discussions pertaining to discovery, defendant repeatedly asserted the state should have provided certain evidence because it bolstered his "defense of another" theory. In opening statement, defendant asserted an individual has the right to defend another if the individual believes the other person's life is in danger. Further, in discussions regarding jury instructions, defendant objected to the trial court's preliminary decision not to provide a defense of another instruction and argued "that's really the theory of our case." (Tr. 1814.) Defendant later renewed his objection, asserting his own testimony established Strojny was fatally injured when defendant came to McKenzie's aid upon McKenzie's request for help. In so arguing, defendant asserted, "[t]hat's our whole case. Really from the

12

beginning we've presented that this was a defense of others case" (Tr. 1839) and "that's been the crux of our entire case." *Id.* at 1845. At defendant's urging, the trial court agreed to give the instruction.

In closing argument, all three parties acknowledged the dual nature of defendant's defense. While the state maintained defendant's and McKenzie's actions combined to cause Strojny's death, it also acknowledged defendant's defense of another theory, arguing the evidence failed to support it. In closing argument, McKenzie noted defendant presented two separate defense theories. Defendant's closing argument first argued "the biggest issue in this case is cause. What caused the death?" (Tr.1912.) Defendant posited Strojny's death was caused by the "one-two punch" of Strojny hitting his head on the concrete step while in McKenzie's headlock. Defendant, however, also argued that if the jury concluded defendant caused Strojny's death, it should find he was justified in doing so in defending McKenzie.

Presumably because the "core" defense of the co-defendants must be mutually antagonistic in order to warrant severance, defendant notes no case in which a defendant, as here, pursued alternative defense theories, yet argued for severance on grounds that one of those theories was mutually antagonistic to a co-defendant's single defense theory. We decline to extend the case law pertaining to severance to include the presentation of multiple "core" defenses, especially when the record is unclear which defense is defendant's "core" defense.

To the extent defendant's "defense of another" theory is his "core" defense, such defense is not mutually antagonistic to McKenzie's "no causation" theory. "Defense of another is a variation of self-defense." *State v. D.H.,* 169 Ohio App.3d 798, 2006-Ohio-6953, at ¶ 32. Self-defense is an affirmative defense. *State v. Brown,* Mahoning App. No. 03 MA 231, 2005-Ohio-4502, at ¶ 14. "This defense does not merely deny or contradict the evidence offered by the State, but rather admits the prohibited conduct while claiming that surrounding facts or circumstances justify the conduct." *Id.,* citing *State v. Grubb* (1996), 111 Ohio App.3d 277, 282. Defendant's "defense of another theory" admits he caused Strojny's death, but contends defendant's actions were justified under the circumstances. As McKenzie also argues defendant caused Strojny's death, the defenses are not mutually antagonistic.

13

Moreover, even if the defenses defendant and McKenzie raised concerning causation arguably were mutually antagonistic, defendant fails to establish prejudice. Mutually antagonistic defenses are not per se prejudicial. *Zafiro,* supra. Further, even where the risk of prejudice is high, severance need not be ordered where " 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.' " *Id.* at 539, quoting *Richardson v. Marsh* (1987), 481 U.S. 200, 211.

For example, defendant at trial argued a joint trial was highly prejudicial because it was likely the jury would convict both co-defendants. Defendants, however, "are not entitled to severance merely because they have a better chance of acquittal in separate trials." *Zafiro,* supra, at 540. Further, the jury verdicts support the inference that the jury meticulously sifted the evidence and did not "unjustifiably infer that the conflict alone demonstrate[d] that both [were] guilty." *Berkowitz,* supra; *State v. Allen* (Apr. 11, 1995), Richland App. No. 94 CA 51.

Similarly, defendant's assertion he was forced to defend against McKenzie's counsel as a "second prosecutor" is insufficient to require severance. While defendant takes issue with McKenzie's efforts to shift the blame for Strojny's death to him, "the relevant inquiry after *Zafiro* focuses on specific and significant prejudice, not on a more general 'second prosecutor' theory." *United States v. Balter* (C.A.3, 1997), 91 F.3d 427, 434, citing *United States v. Beuna-Lopez* (C.A.9, 1993), 987 F.2d 656. Further, "[m]ere finger pointing between co-defendants, i.e., the familiar 'he did, not I' defense, normally is not a sufficient ground for severance based upon mutually antagonistic defenses." *State v. Bunch,* Mahoning App. No. 02 CA 196, 2005-Ohio-3309, at ¶ 43, citing *United States v. Pena-Lora* (C.A.1, 2000), 225 F.3d 17, 33. " 'The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, * * * as a codefendant frequently attempts to "point the finger," to shift the blame, or to save himself at the expense of the other[.]' " *United States v. Flores* (C.A.8, 2004), 362 F.3d 1030, 1039-1040. (Citations omitted.) " 'A defendant does not have a right against having his codefendant elicit testimony which may be damaging to him.' " *Id.* at 1041, quoting *United States v. Andrus* (C.A.7, 1985), 775 F.2d 825, 849.

Similarly unpersuasive is defendant's claim the joint trial prejudiced him when the trial court prohibited specific reference to a prior rape

14

allegation on grounds it would prejudice McKenzie. During opening statement, defendant alluded to a "disagreement" between defendant, Strojny, McKenzie, Nicholas and Ashley several months before the June 7, 2005 incident. (Tr. 178.) The state objected and at a sidebar explained that Nicholas and Strojny were not involved in the prior disagreement; rather, the disagreement arose out of Ashley's allegation that defendant and McKenzie raped her. The state argued the issue was not relevant because the alleged rape was never prosecuted. McKenzie also objected, arguing the rape accusation was improper character evidence.

In the ensuing discussion, defendant indicated he would avoid using the word "rape," but argued he should be able to mention the prior disagreement between Strojny and McKenzie in order to establish it may have precipitated the fight on June 7, 2005. McKenzie not only objected on grounds that any discussion of the rape allegation would prejudice McKenzie but argued the topic highlighted the problem of joinder. The state expressed its fear such testimony would "open a door" that would require the state to present more specific evidence about the rape allegation. Defendant responded that the state should be prevented from doing so, because "all the rape stuff" was a "collateral issue." (Tr. 181.)

Ultimately, the state suggested the matter be limited to a statement that an "incident" occurred in the neighborhood involving Ashley, defendant, and McKenzie, and Strojny and McKenzie were discussing it immediately prior to the fight. (Tr. 187.) Defendant agreed he would "do that if that's the way you want me to say it" and that he had "no problem" with that solution. Id.

Because the rape allegation was lodged against both defendant and McKenzie, the "prior incident" limitation benefitted defendant as well as McKenzie, ensuring no "door" would be opened that would allow the state to present specific evidence of the rape allegation against defendant. Even if defendant were entitled to present specific evidence of the rape allegation against McKenzie in a severed trial, the trial court was within its discretion in concluding that the "prior incident" limitation sufficiently cured any prejudice without the need for severance, especially in view of defendant's agreement to the limitation. *Zafiro,* supra, at 539. Further, despite the "prior incident" limitation, defendant was able to assert that an argument between McKenzie and Strojny precipitated the fight that led to Strojny's death. Indeed, defendant testified the incident caused "strife" between

15

McKenzie and Strojny, and the two argued about it before the "scuffle." (Tr. 1372, 1395-1398.)

Finally, defendant failed to demonstrate the jury was prevented from making a reliable judgment about his guilt or innocence. The trial court properly instructed the jury it was to consider separately the question of guilt, or lack of guilt, of each defendant. A jury is presumed to follow a trial court's instructions. *State v. Fears* (1999), 86 Ohio St.3d 329, 334. To further aid the jury, the court provided the jury with separate verdict forms for each defendant and each charge. *State v. Herring* (Feb. 11, 1999), Mahoning App. No. 96 CA 88. Nothing in the record suggests the joint trial confused the jury or caused the jury any difficulty in separating the evidence as it related to defendant and McKenzie.

Because defendant failed to demonstrate the trial court abused its discretion in refusing to sever his trial from the trial of McKenzie, the first assignment of error is overruled.

*State v. Walters*, 2007 WL 3026956, at *5-11.

In claim three, petitioner asserts that he was denied a fair trial because the trial court refused to admit evidence that McKenzie had allegedly raped the fiancée of Strojny's son, thereby disallowing evidence of McKenzie's motive to harm the victim, and yet permitted evidence that petitioner had threatened Strojny earlier in the day, thereby providing evidence of petitioner's motive. Petitioner does not raise claim three as a separate issue for habeas corpus relief, but in support of habeas corpus claim one. *See Traverse.* The Ohio Court of Appeals rejected his claim as follows:

Defendant[] ... asserts the trial court improperly excluded evidence of the rape allegation against McKenzie. Defendant contends it was relevant and material because it established the predicate for the argument between McKenzie and Strojny that led to Strojny's death.

***

16

> In our discussion of the first assignment of error, we recited much of the parties' initial colloquy regarding the rape allegation. The discussion demonstrates defendant agreed to the "prior incident" limitation and indeed benefitted from it. The issue was raised again immediately preceding defendant's direct testimony when defendant's counsel informed the trial court he instructed defendant, per the court's previous order, not to mention the rape allegation. The trial court permitted defendant's counsel to proffer what defendant would testify: immediately preceding the fight, Strojny, in a fit of rage, called McKenzie a rapist and said he was lucky the police did not arrest him. In response, the state reiterated that if defendant "opened the door" to the rape accusation, the state would elicit testimony from the neighbors that Strojny did not like Ashley and was aligned with defendants regarding the rape accusations. The trial court reiterated its decision to limit mention of the rape allegation to the "prior incident."

> The "prior incident" limitation permitted defendant to explain why McKenzie and Strojny were fighting, while ensuring that no "door" would be opened to allow the state to present more specific evidence about the rape allegation deleterious to defendant. Moreover, contrary to defendant's contention, the purpose of the "prior incident" limitation was not to avoid severing the trial, but to shield both McKenzie and defendant by preventing the jury from hearing specific evidence of the rape allegation. The trial court did not abuse its discretion in excluding the challenged evidence.

*State v. Walters*, 2007 WL 3026956, at *15.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C.

§2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to

or an unreasonable application of clearly established federal law, or based on an unreasonable

determination of the facts in light of the evidence that was presented. 28 U.S.C. §2254(d) provides:

17

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner has failed to meet this standard here.

"[W]hether the trial court erred in denying severance is generally a question of state law that is not cognizable on federal habeas appeal. . . . [A] criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Fox v. Ward,* 200 F.3d 1286, 1292 (10th Cir. 2000), quoting *Cummings v. Evans,* 161 F.3d 610, 619 (10th Cir.1998).

[A]ny errors alleged in the management of a state criminal trial do not deny the defendant due process of law, *see, e.g., Willard v. Pearson,* 823 F.2d 1141, 1149 (7th Cir.1987), unless they are so harmful to the cause of truth that, singly or cumulatively, they make the defendant's conviction fundamentally unfair, *see, e.g., Dudley v. Duckworth,* 854 F.2d 967, 972 (7th Cir.1988). *Bell v. Duckworth,* 861 F.2d 169, 170 (7th Cir.1988), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). More specifically,

. . . In reviewing state court determinations on severance, we will not grant habeas relief unless the petitioner shows both that the trial judge abused his or her discretion in refusing to sever the trial and, further, that the refusal resulted in a trial that was fundamentally unfair. . . . Joint trials may be found fundamentally unfair if codefendants present true "mutually antagonistic defenses" or if the "actual conduct" of the defense of one defendant prejudices another. *Madyun,* 852 F.2d at 1033-34 (citations omitted). *See also Stomner v. Kolb,* 903 F.2d 1123, 1127 (7th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990).

*Lewis v. Hutch,* 964 F.2d 670, 676 (7th Cir.1992). For the reasons discussed by the Ohio Court of Appeals, this Court is not persuaded that such are the circumstances here. *See also United States v. Cope,* 312 F.3d 757 (6th Cir.2002)(discussing the issue in relation to Rule 14 of the Federal Rules of

Criminal Procedure):

> For the sake of promoting efficiency and avoiding the potential for inconsistent verdicts, joint trials of defendants who are indicted together are actually encouraged rather than discouraged. *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also* Fed.R.Crim.P. 8(b) (stating that "[t]wo or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses"). This is especially true when two defendants are accused of participating in a conspiracy or joint scheme. *United States v. Weiner,* 988 F.2d 629, 634 (6th Cir.1992).
>
> . . . Severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Walls,* 293 F.3d at 966 (quoting *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, 122 L.Ed.2d 317). A joint trial of codefendants who present mutually antagonistic defenses is not prejudicial per se. *Zafiro,* 506 U.S. at 538, 113 S.Ct. 933, 122 L.Ed.2d 317. Moreover, a trial court's limiting instructions may "cure" such prejudice. *Id.* at 539, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317.

*Id.,* at 780.  *See also Hutchsion v. Bell,* 303 F.3d 720, 731 (6th Cir. 2004).  This Court is not persuaded that the state court's refusal to grant petitioner's request for a severance so prejudiced petitioner that he was denied a fair trial warranting federal habeas corpus relief.  Although co-defendant McKenzie blamed petitioner for causing Strojny's death, the record fails to reflect that the defendants' defenses were so antagonistic as to deprive petitioner of a fair trial when he was tried with co-defendant McKenzie.  Petitioner was able to argue that he acted in defense of McKenzie.  The jury was made aware of  McKenzie's prior dispute with Strojny, and witnesses testified that McKenzie's actions caused serious physical harm that contributed to Strojny's death.  For all these reasons, petitioner has failed to establish that the state appellate court's decision denying his claim warrants federal habeas corpus relief.  *See* 28 U.S.C. §2254(d), (e).  *See also Williams v. Taylor,* 529 U.S. 362 (2000).

Claims one and three are without merit.

## CLAIM TWO

In claim two, petitioner asserts that he was denied a fair trial because the trial court refused to grant him a continuance to review material untimely disclosed by the prosecutor under *Brady v. Maryland*, 373 U.S. 83, 87 (1963 ).  *Petition*, at 20.  Specifically, petitioner complains that the prosecutor failed to timely disclose that co-defendant McKenzie had told a neighbor that, although he assaulted Strojny,  Strojny had kicked him, *Transcript*, at 27; McKenzie allegedly also said that Strojny had been trying to beat him up, *id.*, at 30-31; McKenzie told Bryan Worboy that Strojny fell down the steps and that petitioner became involved to help McKenzie, *id.*, at 33; McKenzie told his sister that he believed Strojny banged his head on the concrete when Strojny and McKenzie fell, *id.*, at 42; McKenzie told Nicholas Strojny, the victim's son, that they hadn't meant for things to go that far and that petitioner had thought that the victim was going to kill McKenzie, *id.*, at 48; the emergency room physician indicated that he observed only a few minor contusions and no gross injuries on the victim, *id.*, at 50; Nicholas Strojny indicated that his father had serious health problems that might have contributed to his death, *id.*, at 57; Tonda Harris told the police that, although she claimed to have seen some stomping, kicking and fighting, the three men were actually standing too low for her to obtain a clear view, *id.*, at 58; one prosecution summary indicated that the victim was an aggressor who struck McKenzie with his elbow and punched and kicked McKenzie, *id.*, at 61.  *Traverse*, at 24-25.

Respondent contends that petitioner waived this claim for purposes of federal habeas corpus review because he raised the claim in the state courts only in terms of state law and state criminal rules.[1] *See Return of Writ; Respondent's Reply.*  This Court disagrees.  Petitioner argued on direct

---

[1]  In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional

appeal that the trial court erred in denying his request for a continuance after the prosecutor violated *Brady* and Ohio Criminal Rule 16 by failing until the eve of trial to disclose inconsistent or exculpatory statements of witnesses. *See Exhibit 9 to Return of Writ.* Petitioner referred to *Brady,* and other federal cases in support of his claim, as well as to state cases relying on federal law. *See id.* The state appellate court likewise reviewed the claim in the context of both state and federal law:

> Defendant[] asserts the state's failure to timely provide material information violated *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, Crim.R. 16, or both. Defendant contends the material contained exculpatory information that directly supported his defense, inconsistencies that undermined the credibility of prosecution witnesses, and damaging information of which he was previously unaware. According to defendant, the trial court's failure to grant a 40 to 60 day continuance to investigate the leads forced him prematurely to trial and thus denied him a fair trial.
>
> Prior to jury voir dire, defendant noted that on the previous evening, the state provided him access to 22 police informational summaries, including inculpatory and exculpatory statements that defendant, McKenzie, or other witnesses made. The summaries at issue were prepared following police interviews conducted shortly after the incident. Defendant asserted that numerous statements included in the informational summaries should have been provided as part of the state's pretrial discovery.

---

claim. *Anderson v. Harless,* 459 U.S. 4, 6 (1982); *Picard v. Connor,* 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, and is not jurisdictional, *see Castille v. Peoples,* 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000). General allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id.*

\*\*\*

In *Brady,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The court subsequently expanded upon the concept of "material" evidence in *United States v. Bagley* (1985), 473 U.S. 667, 676, holding evidence is "material" only if a "reasonable probability" exists that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Id.* at 682. See, also, *Kyles v. Whitley* (1995), 514 U.S. 419, 434. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.,* quoting *Strickland v. Washington* (1984), 466 U.S. 668, 694.

Here, defendant's due process rights were not violated because *Brady* is not applicable. The *Brady* rule applies only where suppressed exculpatory information is discovered *after trial. United States v. Agurs* (1976), 427 U.S. 97, 103. The state provided defendant the opportunity to examine the informational summaries prior to trial. In addition, the state provided defendant, prior to the commencement of witness testimony, the audiotapes from which the informational summaries were prepared, and defendant had those audiotapes transcribed. "Where exculpatory evidence is revealed prior to trial, the state has timely disclosed the evidence and there is no violation that would require a reversal or mistrial." *State v. Fornash,* Butler App. No. CA2003-04-082, 2004-Ohio-797, at ¶ 20. Indeed, even when exculpatory information is disclosed *during trial,* there is no due process violation under *Brady* as long as " 'the material is disclosed to a defendant in time for its effective use at trial.' " *State v. Iacona* (2001), 93 Ohio St.3d 83, 100, quoting *United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527, 532; *State v. Hanna* (2002), 95 Ohio St.3d 285. The material here was disclosed to defendant in time for its effective use at trial, as defendant was able to effectively cross-examine the pertinent witnesses concerning the statements contained in the informational summaries.

\*\*\*

Defendant contends the state was required under Crim. R. 16(B)(1)(a)(I) to provide the informational summaries in which

22

witnesses related statements defendant or McKenzie made. . . .

[W]e disagree with defendant's contention that the challenged statements were favorable and material and thus discoverable under Crim.R. 16(B)(1)(f). Defendant's failure to demonstrate the statements were favorable and material under *Brady* precludes any relief under Crim.R. 16(B)(1)(f). *State v. Keene* (1998), 81 Ohio St.3d 646, 650 (stating that the words "favorable" and "material" in Crim.R. 16[B][1][f] have the same meaning as in *Brady* ).

***

No evidence suggests the state willfully violated Crim.R. 16. Indeed, the state permitted defendant to review its entire file, including the informational summaries and the audiotapes from which the informational summaries were prepared. In addition, defendant fails to explain with any specificity how earlier disclosure of the informational summaries would have aided his defense. *Jones,* supra, citing *State v. Wiles* (1991), 59 Ohio St.3d 71, 79. Finally, defendant failed to demonstrate how he was prejudiced. As noted, defendant effectively cross-examined the pertinent witnesses, including McKenzie, concerning the content of the informational summaries. Accordingly, the trial court was within its discretion in refusing defendant's request for a continuance. The second assignment of error is overruled.

*State v. Walters*, 2007 WL 3026956, at 11-12 .

Therefore, to the extent that petitioner raises a claim under *Brady*, the Court concludes that he properly preserved this claim for federal habeas corpus review.  He does not appear to argue in these proceedings, and has not properly preserved for federal habeas corpus review, any claim that the trial court denied him due process by refusing to grant his request for a continuance.[2]  Such a

---

[2]  Denial of a continuance rises to the level of a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'...."  *Morris v. Slappy,* 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (quoting *Ungar v. Sarafite,* 376 U.S. 575,

claim was presented to the state courts, but only in terms of state law.

Moreover, the alleged violation of state law does not provide a basis for federal habeas corpus relief. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. §2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Smith v. Sowders,* 848 F.2d 735, 738 (6th Cir.1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir.1988). " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir.1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Such are not the circumstances here.

As to petitioner's claim under *Brady,*

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.,* at 86. Evidence is material

> [i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

_____

589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964))[.]

*Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004).

24

*United States v. Bagley,* 473 U.S. at 682.

> [T]here is never a real *"Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler v. Greene,* 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O' Guinn v. Dutton,* 88 F.3d 1409, 1418 (6th Cir.1996), citing *United States v. Bagley, supra.* "In the absence of prejudice, even assuming a violation of *Brady,* reversal is not required." *United States v. Jones,* 766 F.2d 994, 998 n. 1 (6th Cir.1985), citing United States v. Campagnuolo,* 592 F.2d 852, 861 & n. 9 (5th Cir.1979).

> [T]he "mere possibility" that the evidence might have aided the defense or might have affected the outcome of the trial does not satisfy the materiality element. *United States v. Agurs,* 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Also, a belated disclosure of evidence violates *Brady* only where a petitioner can show that the delay itself caused prejudice. *O'Hara v. Brigano,* 499 F.3d 492, 502 (6th Cir.2007).

*Overbay v. Carlton,* 2008 WL 4682802 (E.D.Tenn. October 21, 2008).

Here, the record fails to establish a basis for federal habeas corpus relief. *See* 28 U.S.C. §2254(d), (e); *Williams v. Taylor, supra.* As noted by the state appellate court, *Brady,* 373 U.S. at 83, applies only where the defendant learns of material exculpatory evidence after the trial. *United States v. Agurs*, 427 U.S. at 103. Moreover, the record fails to indicate prejudice. Petitioner argues that he was prejudiced by the prosecutor's untimely disclosure of witness statements because he could not use the information at trial for impeachment, or otherwise. *Traverse*, at 27. However, petitioner offers no reason for the Court to reach such a conclusion, and the record fails to support this argument.

Claim two is without merit.

## CLAIM FOUR

In claim four, petitioner asserts that the imposition of consecutive terms of incarceration on

his convictions for felonious assault and murder violates the Double Jeopardy Clause:

> The state court violated the double jeopardy clause when it sentenced
> Mr. Walters to consecutive terms for the offenses of felony murder
> and felonious assault, the predicate offense for felony murder.  There
> was a single victim, a single course of conduct, and a single animus.
> Felony murder does not require a separate intent – the offense arises
> when death is a proximate result of the commission of the predicate
> crime.

*Traverse*, at 30.  The state appellate court rejected this claim as follows:

> Defendant's seventh assignment of error contends the trial court
> violated his constitutional protection against double jeopardy and his
> statutory rights under R.C. 2941.25 when it sentenced defendant to
> consecutive prison terms for felony murder and felonious assault.
> Defendant contends felonious assault must merge with felony murder
> because felonious assault is the predicate offense to felony murder.
> Defendant maintains that because both crimes involved a single
> victim, a single course of conduct, and a single animus, defendant
> should have been convicted and sentenced on only one of the
> offenses.
>
> In *State v. Hall,* Franklin App. No. 05AP-957, 2006-Ohio-2742, this
> court addressed the interplay between state and federal constitutional
> protections against double jeopardy and Ohio's multi-count statute,
> R.C. 2941.25.  There, we noted that "[t]he federal and state
> constitutions' double jeopardy protection guards citizens against
> cumulative punishments for the 'same offense .' " *Id.* at ¶ 16, citing
> *State v. Moss* (1982), 69 Ohio St.2d 515, 518.
>
> "Despite such constitutional protection, a state legislature may impose
> cumulative punishments for crimes that constitute the 'same offense'
> without violating double jeopardy protections." *Hall,* at ¶ 16, citing
> *State v. Rance* (1999), 85 Ohio St.3d 632, 635, citing *Albernaz v.
> United States* (1981), 450 U.S. 333, 344. "Under the 'cumulative
> punishment' prong, double jeopardy protections do 'no more than
> prevent the sentencing court from prescribing greater punishment than
> the legislature intended.' " *Hall,* at ¶ 16, quoting *Missouri v. Hunter*
> (1983), 459 U.S. 359, 366. "When a legislature signals its intent to
> either prohibit or permit cumulative punishments for conduct that may

26

qualify as two crimes, the legislature's expressed intent is dispositive." *Hall,* at ¶ 16, citing *Rance,* at 635. "Therefore, when determining the constitutionality of imposing multiple punishments against a criminal defendant in one criminal proceeding for criminal activity emanating from one transaction, appellate courts are limited to assuring that the trial court did not exceed the sentencing authority the legislature granted to the judiciary." *Hall,* at ¶ 16, citing *Moss,* at 518, citing *Brown v. Ohio* (1977), 432 U.S. 161.

"Under an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared *in the abstract.*" (Emphasis sic.) *Rance,* at paragraph one of the syllabus. In determining whether the elements of the crimes are of similar import, "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other." *Id.* at 638. "If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends; the multiple convictions are permitted." *Hall,* at ¶ 17, citing *Rance,* at 636.

In *State v. Henry,* Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 59-60, this court approved and followed an Ohio appellate court's rejection of the precise challenge defendant raises and concluded that because felony murder involves "causing death while committing a first or second-degree felony of violence," but "felonious assault requires knowingly causing serious physical harm to another," "[t]he commission of one crime does not result in the commission of the other." *Id.* Because felony murder and the predicate offense of felonious assault thus are not allied offenses of similar import, R.C. 2941.25 authorizes punishment for both crimes, and no double jeopardy violation occurs. See, also, *Keene,* supra, at 668; *State v. Lowe,* Franklin App. No. 04AP-1189, 2005-Ohio-6614; at ¶ 28 (noting "the Ohio Supreme Court has consistently held that predicate offenses do not merge into felony murder"). The seventh assignment of error is overruled.

*State v. Walters,* 2007 WL 3026956, at *19-20.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause has been interpreted as protecting

27

criminal defendants from successive prosecutions for the same offense after acquittal or conviction, as well as from multiple punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165 (1977). The traditional test for double jeopardy claims is the "same elements" test set forth in *Blockburger v. United States,* 284 U.S. 299, 304 (1932) (requiring a court to determine whether each charged offense "requires proof of an additional fact which the other does not"). The *Blockburger* test is designed to deal with the situation where closely connected conduct results in multiple charges under separate statutes. Under *Blockburger,* the critical question is whether the multiple charges in reality constitute the same offense. Thus, the *Blockburger* test focuses on whether the statutory elements of the two crimes charged are duplicative. If the elements of the two statutes are substantially the same, then double jeopardy is violated by charging the defendant under both.[3]  However, the *Blockburger* test "should not be controlling where, for example, there is a clear indication of contrary legislative intent."  *Missouri v. Hunter*, 459 U.S. 359, 367 (1983), quoting *Albernaz v. United States*, 450 U.S. 333, 340 (1981).

> Where... a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

---

[3]  In *Grady v. Corbin,* 499 U.S. 508, 519 (1990), which was decided after *Blockburger,* the United States Supreme Court held that the Double Jeopardy Clause also barred prosecution of multiple offenses where the government, in order to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted. However, the Supreme Court overruled the "same conduct" rule of *Grady,* concluding that *Grady* was inconsistent with Supreme Court precedent and the common law understanding of double jeopardy. *United States v. Dixon,* 509 U.S. 688, 704 (1993).

*Missouri v. Hunter,* 459 U.S. at 368-69.

In addition, a defendant cannot be prosecuted for a greater offense after conviction or acquittal of the lesser included offense. *Brown v. Ohio, supra,* 432 U.S. 161.  In *Brown,* the defendant had been convicted of the offense of joyriding and was subsequently convicted of the offense of auto theft. Both convictions were based on the same events. Under Ohio law, joyriding is a lesser included offense of auto theft. The Supreme Court, noting that conviction on a charge of joyriding required no proof not required for conviction on a charge of auto theft, held that the subsequent prosecution on the greater charge was precluded by double jeopardy principles. *Id.,* at 168-69. The Supreme Court emphasized that the prohibition of successive prosecutions serves a policy of finality, protecting a defendant from a government's attempts to re-litigate facts or secure additional penalties. *Id.,* at 165-66.

The indictment in this case charged petitioner with the offense of murder under O.R.C. §2903.02, *i.e.*, causing the death of Richard J. Strojny as a proximate result of committing felonious assault; the indictment also charged petitioner with felonious assault in violation of O.R.C. §2903.11, specifically alleging that petitioner knowingly caused serious physical harm to Richard J. Strojny. *Exhibit 1 to Return of Writ.*  Respondent argues  that petitioner's convictions and sentences on both charges do not violate the Double Jeopardy Clause because the Ohio Supreme Court has "clearly ruled on the Ohio legislature's intent" in this regard:  "[I]t is well established that 'felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony,'"  *State v. Campbell*, 90 Ohio St.3d 320, 347 (2000)(internal citations omitted), citing *State v. Keene*, 81 Ohio St.3d 646, 668 (1998);  *State v. Logan*, 60 Ohio St.2d 126, 135 (1979). However, *Campbell* involved convictions for aggravated murder under O.R.C. §2903.01(B) and kidnapping  in violation of O.R.C. §2905.01 – different charges than those at issue in this case.  Further, the Ohio Supreme Court has

29

recently held, in *State v. Williams*,124 Ohio St.3d 381 (2010), that felonious assault under O.R.C. §2903.11(A)(1) and **attempted** felony murder under O.R.C. §§ 2903.02 2923.02(A) are allied offenses of similar import under O.R.C. §2941.25(A) requiring a merger of convictions and sentences. *Id*., at paragraph one of the syllabus. Similarly, other Ohio appellate courts, in addressing the precise issue presented here, have concluded that convictions on charges of felony murder and felonious assault violate Ohio's statute on allied offenses. *See., e.g., State v. Minifee*, No. 91017, 2009 WL 1819493, at *16  (Ohio App. 8th Dist. June 25, 2009)(" . . . we fail to see how a person could commit felony murder based on the predicate offense of felonious assault without also committing the felonious assault."); *State v. Scandrick*, No. 23406, 2010 WL 2018110, at *12 (Ohio App. 2nd Dist. May 21, 2010); *State v. Mills*, No. 2007 AP 07 0039, 2009 WL 1041441, at *32-33 (Ohio App. 5th Dist. April 15, 2009); *State v. Alsup*, No. 23641, 2010 WL 3365934, at *1-2 (Ohio App. 2nd Dist. Aug. 27, 2010).

This Court is unable to discern how petitioner could have committed the crime of felony murder in this case without also committing the crime of the underlying felonious assault.  Further, in view of the Ohio cases referred to above, this Court is not persuaded by respondent's argument that the State of Ohio plainly indicated an intent to separately and cumulatively punish both of these criminal acts.  Under these circumstances, the Court concludes that the imposition of consecutive terms of incarceration on petitioner's convictions for felonious assault and murder violate the Double Jeopardy Clause.  Petitioner's fourth claim is therefore meritorious.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that the petition for a writ of habeas corpus be **GRANTED** on claim four, and that this action be **REMANDED** to the state trial court for re-sentencing. The Magistrate Judge further **RECOMMENDS** that the remainder of petitioner's claims be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


  *S/ Norah McCann King*
Norah McCann King
United States Magistrate Judge


December 29, 2010